FILED & ENTERED

OCT 05 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY hawkinso DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>Jose Del Valle and Olivia Del Valle,<br><br>                          Debtor(s),<br><br>CYNTHIA K. DANIEL, CYNTHIA K. DANIEL LIVING TRUST DATED MARCH 16, 2004 AND EQUITY TRUST COMPANY CUSTODIAN FBO CYNTHIA K. DANIEL,<br><br>                       Plaintiffs,<br><br>v.<br><br>ROBERT JOSE DEL VALLE AND OLIVIA DEL VALLE,<br><br>                     Defendant(s). | Case No.: 6:10-bk-12942-MJ<br><br>Adversary No.: 6:10-ap-01361-MJ<br><br>Chapter: 7<br><br>**MEMORANDUM DECISION AFTER TRIAL**<br><br>Trial Dates: January 30, 2017 - April 10, 2017<br>Submission Date:    June 16, 2017<br>Location:    Courtroom 301<br>           3420 Twelfth Street<br>           Riverside, CA 92501 |

### INTRODUCTION

As succinctly stated in a recent trial decision from Hawaii,

"'[f]alse pretenses, a false representation, or actual fraud' does not

1    always require an express misrepresentation.  For example, 'a debtor's

2    misleading conduct intended to convey an inaccurate impression may

3    constitute false pretenses.'" *In re Higashi*, 553 B.R. 153 (Bankr. D.

4    Hawaii 2016).  The investment scheme that Defendant/Debtor Jose Robert

5    Del Valle (Del Valle)[1] lured Plaintiff Cynthia Daniel (Daniel) to

6    participate in was just such false pretense.  By making affirmative

7    misrepresentations of fact, omitting disclosure of pertinent facts which

8    he had a duty to disclose, and creating a false pretense of a low risk,

9    high return investment program, Del Valle caused Daniel to part with her

10   money because of his fraud.  As a consequence, this court finds that the

11   debt owed by Del Valle to Daniel is nondischargeable under

12   § 523(a)(2)(A).[2]

FACTUAL BACKGROUND[3]

14        Daniel's friend Greg Harper, a real estate broker, met Del Valle at

15   a gym in 2006.  Over the course of several conversations, Del Valle

16   described to Harper a new real estate business, RDV Consulting, Inc.

17   (RDV), that he had undertaken with Ralph Solis (Solis) which bought

---

[1]  The complaint in this case names both Robert and his co-debtor wife
Olivia Del Valle as defendants.  On April 15, 2016, the court granted
summary judgment for Olivia.  The discharge of the debt with regard to
Olivia will be reflected in the Judgment to be entered in this case.
This Judgment will be subject to the provisions of § 524(a)(3) described
at the end of this Memorandum.

[2]  Unless otherwise indicated, all chapter and section references are to
the Bankruptcy Code, 11 U.S.C. §§ 101-1532 and "Rule" references are to
the Federal Rules of Bankruptcy Procedure.  "Civil Rule" references are
to the Federal Rules of Civil Procedure.

[3]  This Memorandum shall serve as the court's findings of fact and
conclusions of law as allowed by Rule 7052(a).

second trust deeds at a discount and resold them to investors, who then
profited when the trust deeds paid off at their face value.  Because of
high loan to value on the trust deeds, even if the homeowner who was the
obligor on the trust deed defaulted and foreclosure was necessary, the
ultimate return would always be profitable to the investor.  Harper was
enticed about the investment opportunity and soon described Del Valle's
business to Daniel.  Daniel had recently sold a house and had $400,000 in
profits which she was seeking to invest, so she became interested in Del
Valle's business.

Del Valle sent Harper an email which described an investment
opportunity in trust deeds purportedly owned by Solis.  Harper shared the
email with Daniel, who then initiated her own contact with Del Valle.
She first met with Del Valle in Temecula in April 2006 with her friend
Kim, then later (after her first two investments) attended a meeting of
an "exclusive" small group of investors (8-10 in number) at a community
clubhouse, also in Temecula, in May 2006.  This meeting was conducted by
Del Valle, assisted by Solis regarding details about the trust deeds, and
presented a comprehensive picture of the trust deed investment business.
Del Valle and Solis held themselves out as "partners" and talked about
themselves as "we."  The information conveyed at that meeting, and
confirmed repeatedly at subsequent meetings and in email communications,
turned out to be primarily false and was meant to induce Daniel and
others to invest money with RDV.

Del Valle described how these investment opportunities arose.
Solis had unique access to a market to purchase second trust deeds
(presumably at a discount, although that detail was not explained in any

testimony; however, only discount buying could have generated the

projected profits).  He had more trust deeds available to him than he

could personally buy[4] and needed the investment dollars of others to

maximize the business.  RDV was interested only in a small, exclusive

group of investors because it wanted to present these unique

opportunities to only a select few.  Before any trust deeds were offered

for purchase, they would be thoroughly vetted, confirming the homeowners

who had the obligation to pay, any senior liens on the property, and the

loan to value which would demonstrate the minimal risk involved in the

purchase.  The trust deeds would be assigned to Solis in writing and then

would be presented to the investors with a known return and a fixed due

date.  The funds invested would be used only for the purchase of each

particular trust deed, not commingled with other funds.  Similarly, the

payouts would come exclusively from each designated homeowner, through a

refinance or sale of the real property.  If monthly payments were due on

the trust deeds, the source of those funds would be the homeowner.

When questioned by the attendees at the meeting about what would

happen if the homeowners did not pay, Del Valle represented that they

would foreclose on the property and realize the advertised profits and

late fees because of the cushion of equity afforded by the favorable loan

to value.  The need to foreclose would cause a slight delay in receiving

returns, but the returns were assured.  Although all of the assignments

---

[4]  Daniel, Del Valle and others all called them "deeds".  Because they were not deeds, rather were trust deeds, the court declines to use the erroneous term.

would be held by Solis, most of them would not be recorded for tax reasons.

Daniel was impressed with the presentation and excited to be invited into the exclusive group of investors.  In her words, she was "on cloud 9."  As she began investing, the sales pitch of Del Valle continued.  There was a second meeting of the exclusive group in August, 2006, where much of the same information was discussed.  During these meetings and in other communications, Del Valle emphasized his knowledge and expertise in the business and on his letterhead held himself out as "Dr. Del Valle" which conveyed to Daniel, an engineer by training and profession, his education, credential, and success.

The investment opportunities were presented to Del Valle by Solis[5] and then to potential investors, including Daniel, by email.[6]  Purchases were documented with paperwork generally on the RDV letterhead, Second Trust Deed Division, which identified the investor, property address, property owner, prior trust deed amount (if any; eventually RDV also sold firsts), new/second trust deed amount, loan to value, investment amount, return amount and due date.  Such document was signed by Daniel and a representative of RDV, usually Del Valle.  Accompanying this document was usually an Investment Agreement, Short Term Note.[7]

---

[5]  See Exhibit 217 at 4192 to 4207.

[6]  An example of such email is Exhibit 313 at 001, an investment opportunity email sent to Harper that he forwarded to Daniel and resulted in her first two investments In March/April 2006.

[7]  Examples of these documents are found as Exhibits 2 – 63 and others.

The business operation and cash flow pattern of RDV was established early on between Del Valle and Solis.  Solis would email the investment chance to Del Valle, who would determine how much profit he could take, then repackage it and email it out to his investor pool.  When the money came in, Del Valle took his self-determined "commission" and sent the balance to Solis.  When trust deeds came due each month, an RDV employee advised Solis what money they would need, not only to pay out the deeds but also to cover the payroll and operating expenses of RDV.  Solis would then send a check to RDV in the sum necessary to cover these requests. Del Valle took no steps to verify the source of the funds coming from Solis.[8]

In conversations with Daniel on several occasions, Del Valle represented that he had done a thorough investigation of the property to establish the loan to value.  He claimed to have used a website available to him as a real estate professional (identified through trial testimony as a Land Title Comparison Report or Comparative Market Analysis) by which he determined the market value of the property and the amount due on existing liens so that he could calculate the loan to value which established that the investment opportunity was secure and the return certain.  He also stated that he had regular meetings with Solis whereby Solis showed him the written assignments and verified the expected returns.

Daniel's first investments were in April 2006, Paris Street and Shady Lane in Hemet,  with payoff dates of October and November 2006 and

---

[8]  This business pattern was not described to Daniel by Del Valle.

returns of $15,000 on $35,000 invested and $30,000 on $65,000 invested.

Both paid off early, according to Del Valle because the property owners refinanced early. Encouraged by this performance and the continued confidence of Del Valle that each subsequent opportunity had a safe loan to value and generous return, Daniel kept investing throughout 2006, 2007, and 2008, with her last investment made in November 2008. Her last "paid" deed of trust purchase was in May 2008[9]. Her earliest "unpaid" trust deed purchase was in September 2007.[10]

Because of the extraordinary returns Daniel was receiving, she shared news of these profits with her friends, who became interested in making their own investments. When asked, Del Valle said he could not expand his investor pool to include others because of its exclusive nature but he suggested that the friends could invest through Daniel. As a consequence, starting in October 2006, Daniel made investments for her friends, some of which were paid deeds and others which were not. For each such transaction, Daniel prepared paperwork similar to that utilized by RDV. At her friends' insistence, she also received a small payment for her "services" from them.[11] Significantly, trial testimony and other evidence did not reflect that any of these friends (other than perhaps

---

[9]  The "Paid Deeds" were set forth in Exhibit 323, starting with purchases in April 2006 which paid out in October and November 2006 and ending with a purchase on May 18, 2008 which paid out on November 16, 2008.

[10]  Exhibit 324 identifies the "Unpaid Deeds".

[11]  Daniel was aware that Del Valle was taking a "commission" on her trust deed transactions, although she did not know how much nor how he calculated his take.

Kim during the early meeting in Temecula) ever met Del Valle or heard his

sales pitch  They relied on Daniel's version of what he represented.  In

addition, although many of them suffered significant economic losses when

they received no returns of principal or expected profit, none held

Daniel responsible for these losses.  Daniel testified none of her

friends thought she had a claim against Daniel and none have ever sued

her or taken any other steps to enforce such a claim.

Near the end of 2006, energized by all the money he was making from

the trust deed investments, Del Valle sent an email[12] to the exclusive

investment group which touted the tremendous success of the venture and

outlined growth opportunities for the business.  He also shared that he

was going back to school at the Anderson School of Business at UCLA to

"attain the latest knowledge in growth modules."  Daniel remained

impressed by his credential, which bolstered her confidence in her

continued investments.

Daniel received returns as expected throughout 2006 and 2007, but

by the spring of 2008 some pay outs were late or not made at all. Oral

and email conversations began internally at RDV between employees Namaiya

Ward, Robert Ulloa, Del Valle and others about how to cope when the funds

did not come timely from Solis to make each month's payments on the trust

deeds coming due.  Daniel began vigilantly questioning first Del Valle,

then eventually Solis about the reasons for the late payments.  She was

told homeowners were having a hard time refinancing because of the dip in

the economy; also, they told her that when they had determined a

---

[12]  Exhibit 310 at 101609-10.

refinance would not be possible, RDV was foreclosing on the properties. She was strung along with a variety of updates and excuses, some of which identified in detail the properties and the status of the collection activities – i.e. all documents were in escrow for a refinance to close, foreclosure was in process.  She was never told that the payments made came from other new investments or from Del Valle's or Solis's own funds. Thus, her confidence remained high enough that she made her final investment of $70,000 in November 2008.

Solis got directly involved and to stave off discovery of his scam, offered some investors, including Daniel, swap outs, replacing non-paying trust deeds with new ones with a due date farther in the future. However, inevitably those efforts could not keep upset investors satisfied.  One such investor took it upon himself to go talk to a homeowner, an activity forbidden from the outset by RDV, and learned that the homeowner knew nothing about an assigned deed of trust.  The Ponzi scheme was exposed:  Solis never had assignments of any deeds of trust that he bought at a discount; the funds paid out had been coming from new investment funds which had all been deposited into the same general account at RDV and used at Del Valle's discretion, at first to pay investment balances to Solis but eventually to pay himself, RDV operating expenses, and the investors who were complaining the loudest about a late pay out.  In fact, by mid 2008 it was not unique that the funds from an investor's "new" purchase were turned around on almost the same day to pay the same investor on a past due trust deed.

The scheme exposed, investors, including Daniel, began suing RDV, Solis and Del Valle in state court for fraud and other causes of action.

1   Solis was criminally charged, pled, and went to prison.  Del Valle filed

2   chapter 7 and, in response to a Department of Real Estate accusation,

3   surrendered his broker's license.

4

5                              PROCEDURAL BACKGROUND

6        Del Valle filed his chapter 7 petition on February 2, 2010.  When

7   he filed, Daniel and other creditors were pursuing him in state court

8   proceedings in Los Angeles and Riverside counties.   As a result, from

9   March through May, 2010, three creditor groups, Hooten, Pitt et al, and

10  Daniel, moved for relief from the automatic stay to pursue their cases in

11  state court, which motions were granted soon thereafter.[13] Each such

12  creditor then filed an adversary proceeding, seeking nondischargeability

13  of the debt which was to be liquidated in state court.  Daniel filed this

14  proceeding on May 18, 2010.

15       On July 30, 2010, the United States Trustee (UST) filed an action

16  for denial of discharge under § 727 due to inaccuracies and

17  inconsistencies in the debtors' schedules.  Summary judgment was granted

18  on behalf of the UST and a Judgment Denying Discharge for both debtors

19  was entered on December 7, 2011.  Based on the general denial of

20  discharge, this court dismissed the § 523 adversaries as moot on January

21  6, 2012.  On December 6, 2012, debtors brought a motion to vacate the

22  Judgment Denying Discharge, arguing lack of due process and a meritorious

23  ─────────────────

24  [13]  At this time, the Del Valle case was assigned to Judge Peter Carroll
     who transferred the case to this judge when he moved to Los Angeles.  It
25   is unlikely this judge would have granted stay relief for matters which
     ultimately had to be resolved in bankruptcy court – i.e. the issue of
26   nondischargeability.

27

28                                    - 10 -

defense.  On March 19, 2013, this motion was granted due to, among other things, service errors by the UST of the Summary Judgment motion.  The right to a discharge having been restored, on March 19, 2013, the court also reinstated the § 523 adversaries, including the Daniel case.  Eventually, the UST determined that debtors were entitled to a general discharge and dismissed its adversary by stipulation on October 29, 2014, as ordered by the court on November 26, 2014.  Debtors were granted their general discharge on September 11, 2017.[14]

Only Daniel continued to prosecute her adversary proceeding[15] and on May 6, 2013, she removed the state court proceeding to the bankruptcy court.  The removal adversary was consolidated with this case by order entered on June 3, 2013.  Soon thereafter, an order was entered which allowed the parties to use the state court discovery for all purposes in this litigation.  Other than the order consolidating and the discovery order, no mention was again made of the state court proceeding.

In October 2015, Del Valle filed a motion for summary judgment, the resolution of which was delayed when Daniel gained access to computer records, including emails, which had been previously unavailable.  After discovery was completed, Daniel opposed the motion, arguing among other things that factual issues, including intent, were disputed.  The court agreed facts were in dispute and denied summary judgment for Del Valle on

[14]  In preparing this Memorandum, the court discovered that the clerk's office had failed to process the discharge after the § 727 action was dismissed in 2014.  The debtors being otherwise qualified for a discharge, the court instructed the clerk's office to enter the discharge, which was done on September 11, 2017.

[15]  The others were voluntarily dismissed in 2015.

April 15, 2016, clearing the way for PreTrial and trial.  In its

Memorandum Supplementing Oral Ruling on Motion for Summary Judgment, the

court focused on the allegations that Del Valle would be liable for fraud

if he knew or should have known that the trust deed assignments were

false and that Solis was operating a Ponzi scheme.[16]  Despite this focus,

however, the court did not enter a partial summary judgment or otherwise

limit the scope of the fraudulent representations or omissions or false

pretense which Daniel might prove to establish fraud.

Moreover, in light of the provisions of Civil Rule 15, made

applicable in the bankruptcy court by Rule 7015, that "[w]hen an issue

not raised by the pleadings is tried by the parties' express or implied

consent, it must be treated in all respects as if raised in the

pleadings," the court's judgment will be based on the case for fraud

actually proved at trial by Daniel.  The court finds implied consent

occurred, which allows this court to do justice, for absent such ruling

Del Valle's comprehensive fraud would go without consequence.

On May 25, 2016 the parties filed their PreTrial Stipulation.  That

stipulation made no reference to the state court claims, nor were they

mentioned in Plaintiff's Trial brief, opening statement, or initial post

trial brief.  Belatedly, when counsel recognized that he had not

requested punitive damages in the bankruptcy adversary, he posited in his

final post trial brief that punitive damages were available "because the

---

[16]  That focus was not surprising because the Complaint and much of
Daniel's rhetoric leading up to the Summary Judgment Motion had centered
on trying to tie Del Valle into fraud liability based on Solis's guilty
plea to operating a Ponzi scheme.

state court complaint had been tried", referring to the consolidation order.

This court finds and concludes that the state court complaint was not tried; the only trial conducted was of the § 523 claims in the original bankruptcy court complaint.  All other claims were waived by implication by the PreTrial Stipulation and the other briefs and arguments.[17]

<u>OVERVIEW OF WITNESSES AND DOCUMENTARY EVIDENCE</u>

With the exception of Blanca Ortiz, called out of order by Del Valle, all witnesses testified in support of Daniel's case in chief. Although Del Valle testified as an adverse witness during Daniel's case and was subject to limited cross examination by his counsel during that testimony, he declined the opportunity to testify on direct examination on his own behalf.[18]  During such testimony, Del Valle was charming but he was neither consistent nor credible on many important details.  It was easy for the court to understand how he engendered trust and confidence from his investors, as he was a good salesman for himself and anything he might be selling.  For a person such as Daniel, unsophisticated in real estate investments, it is no wonder that she believed him – "he was one

---

[17]  As noted later in this Memorandum, even if punitive damages had been pled, the court would not have granted them because it could not make the necessary findings to support an award.

[18]  The final trial date, April 10, 2017, had been reserved for presentation of Del Valle's defensive case.  To the surprise of the court, on that date Del Valle rested without calling any other witnesses, including himself.

1  of the good guys." However, to a person schooled in real estate lending

2  and in particular with knowledge of the second trust deed resale market,

3  his testimony and the story he was weaving made little economic or

4  practical sense. He was too short on details, too glib.

5      Daniel's examination of Del Valle, in particular when portions of

6  his deposition were read about the websites he was using to verify loan

7  to value and how he ascertained that Solis had written assignments,

8  established inconsistent stories.  Among other things, at the time of his

9  trial testimony he had apparently forgotten about the "ghost" trust deeds

10 he mentioned during the deposition.  The court did not know which of the

11 conflicting testimony to believe.  His lack of details about which title

12 company websites he relied upon to determine property values and the

13 amounts due on prior loans underscored the questionable credibility of

14 his testimony.  His claimed ignorance about foreclosures was astonishing

15 for a former real estate broker.  In sum, the court had serious doubts

16 about Del Valle's truthfulness.

17     Third party investors Gregory Harper and Theodore Hooten, although

18 believable, added little to Daniel's case.  If anything, Daniel's early

19 reliance on Harper might have undermined her assertion that she relied on

20 Del Valle's representations regarding the bona fides of the investments.

21 However, Del Valle's repetitive sales pitch over time overrode any such

22 early reliance, and Daniel clearly relied on him when making her unpaid

23 investments.  Also, Harper's testimony about representations he heard

24 from Del Valle reinforced Daniel's recollection of what Del Valle said

25 and did.

26

27

28                                    - 14 -

In contrast, Hooten was not the least bit helpful and added more confusion about the investment scheme. His testimony implied that he had no direct dealings with Del Valle at all and therefore he could not reinforce Daniel's story about what she heard. Hooten dealt directly with "his ex-best friend" Brett Anderson and Michael Lugo. The relationship of these individuals to RDV or Del Valle was unclear.[19] What was clear was that the investment concept Lugo was selling was different than the Del Valle/Solis scheme. Hooten thought the money he paid went directly to the homeowner and the second trust deed was created at the time of the investment, a very different scenario than that sold by Del Valle. If that is how Lugo "sold it" to Hooten, the fraud of Del Valle was not involved at all.[20]

Marco Valezquez, briefly the broker of record for RDV, was remarkable only for how little he knew about anything Del Valle and Solis were doing. In contrast, Namaiya Ward was directly involved with the trust deed transactions and provided credible insider views of Del Valle's activities while Ward worked for RDV. His testimony that he never saw any trust deed assignments and could not verify that Solis really "brought in the deeds" was telling, although he carefully did not cast aspersions on his former bosses. He did reinforce the emails which showed that Del Valle was commingling the investor funds by depositing

---

[19]  All of Hooten's paperwork with RDV was in the name of Lugo or Lugo/Hooten as investor, reinforcing that he never dealt directly with Del Valle. See Exhibit 315.

[20]  In summation, what Hooten really wanted to tell the court was that he had lost $110,000 and he was angry. It is doubtful he ever had a fraud claim against Del Valle.

them into the same bank account from the beginning and that those funds were used to pay operating expenses, Del Valle's own returns, and eventually other investors for trust deeds payouts.  The candor of his testimony, without laying blame, was refreshing.

The testimony of Daniel was entirely credible.  Cross examination by Del Valle's counsel never impugned her honesty.  Her records were organized and she documented her damages well.  The court gave credence to her case in chief from her testimony and exhibits.

Blanca Ortiz was honest.  But as discussed later, her testimony did not really support that Del Valle was a victim.

The testimony of expert real estate broker Joffrey Long not only expressed appropriate opinions, but was sufficiently objective for the court to give it great weight.  He was properly prepared and understood the details of the investment scheme concocted by Del Valle and Solis. In that sense, his description of the ordinary duties of a real estate broker when dealing with second trust deed investments assisted the court in determining Del Valle's duty to disclose and therefore his omissions. His knowledge and description of what types of reliable information a broker could ascertain from title company websites reinforced the court's own perception that Del Valle was lying when he gave testimony about how he determined the high loan to value he was touting.

In contrast, the testimony of accountant Gary Capata was entirely worthless.  Whereas Long had been properly advised of the RDV business operation, Capata had a perception the business was different than described by all other testimony.  For some reason, he thought RDV was originating the trust deeds, not reselling them at discount.  He had no

knowledge of how RDV was making money – by taking a cut out of the profit
cushion on each of Solis's repackaged trust deeds – so his review of the
books and records to track profitability was useless.  He also entirely
misconstrued Del Valle's testimony that 90% of his business was the sale
of second trust deeds to mean that 90% of the cash flow in and out of the
single checking account should represent the profits and losses of such
operation.  His assumptions were so farfetched that his conclusions were
illusory.  Why he was instructed so poorly about his assignment remains a
puzzle to the court.  Also, unless Daniel's counsel did not understand
this expert's report and testimony, the court fails to understand why he
was called as a witness at all since his testimony was based on improper
assumptions.

     The court made its rulings regarding admissibility of the
documentary evidence during trial and such rulings will stand.  Relying
on an improper and misleading transcript from February 2, 2017, Daniel
argued in a post trial brief that the court had admitted Exhibit 318,
Response of Robert Jose Del Valle to Special Interrogatories (Set One),
when it was discussed during trial and that the court's exclusion of that
exhibit at the close of trial was error.  By way of background, counsel
had identified the interrogatory responses so that he could read an
answer into the record during the examination of Del Valle.  Since he was
referring to a document not on the Exhibit List, the court had it marked
for identification as Exhibit 318:  "Since we're going to ask about this
on the record we better give it a number.  I'll call it next in line.
318 is the response of Robert Del Valle's [to] special interrogatory Set
1."  The transcript of the spoken words in the proceeding, submitted to

the court as an exhibit to a post trial brief, reflects that the attorney

for Daniel never offered Exhibit 318 into evidence.  In error, however,

the transcriber offered in italics its own incorrect perception:

*Plaintiff's Exhibit 318 Admitted Into Evidence.*  That did not happen.

When the court saw the argument in the brief, it immediately arranged for

the transcriber to correct the transcript, the corrected version of which

was filed with the court on July 5, 2017.[21]  Exhibit 318 was not offered

and it was not admitted.[22]


LEGAL ANALYSIS

   (A)   Jurisdiction

   The bankruptcy court has jurisdiction over a complaint for

nondischargeability of debt under 28 U.S.C. § 157(a).  This matter is a

core proceeding under 28 U.S.C. § 157(b)(2)(I), which empowers this court

to enter the final findings and conclusions and judgment in the case.

   (B)   False misrepresentations, fraudulent omissions, false pretenses –

general standards

   A chapter 7 discharge does not discharge an individual from any debt

for money to the extent that the debtor obtained it by "false pretense, a

false representation, or actual fraud…" § 523(a)(2)(A).  Exceptions to

---

[21]  Docket # 396.

[22]  The court would have denied admission if it had been offered.
Discovery responses are admitted only to the extent portions of them are
read into the record.   The entire document is never admitted.

1  discharge must be strictly construed in favor of the debtor in order to

2  effectuate the Bankruptcy Code's goal of giving debtors a fresh start.

3  *Caneva v Sun Communities Operating Ltd.P'ship (In re Caneva)*, 550 F. 3d

4  755, 781 (9th Cir. 2008).  Generally, the elements necessary to establish

5  nondischargeability under § 523(a)(2)(A) track those for proving common

6  law fraud:  (i) misrepresentations, fraudulent omission, or the debtor's

7  deceptive conduct; (ii) knowledge of the falsity or deceptiveness of the

8  statement or conduct; (iii) an intent to deceive; (iv) justifiable

9  reliance by the creditor on the debtor's statement, omissions, or

10 conduct; and (v) damages to the creditor proximately caused by the

11 reliance on the debtor's statements or conduct.  *In re Deitz*, 760 F. 3d

12 1038, 1050 (9th Cir. 2014); *American Express Travel Related Servs Co. v*

13 *Hashemi (in re Hashemi)*, 104 F. 3d 1122, 1125 (9th Cir. 1996).  The

14 creditor must prove these elements by a preponderance of the evidence.

15 *Grogan v Garner*, 498 U.S. 279 (1991).

16     Omitting critical facts which a debtor has a duty to disclose may

17 lead to a finding of fraud.  In order for an omission to give rise to

18 liability, there must be a duty to disclose.  *Apte v Japra M.D.,*

19 *F.A.C.C., Inc. (In re Apte)*, 96 F. 3d 1319, 1324 (9th Cir. 1994);

20 *Citibank, N.A. v Eashai (In re Eashai)*, 87 F. 3d 1082, 1089 (9th Cir.

21 1996) (concluding that an omission can be fraudulent and actionable under

22 § 523(a)(2)(A) when the debtor had a duty to disclose the omitted facts).

23 In order to determine whether a duty to disclose exists, the bankruptcy

24 court must look to the common law concept of fraud, found in the

25 Restatement.  See F*ield v Mans*, 516 U.S. 59, 71 (1995); *In re Apte*, 96 F.

26 3d at 1324.

27

28

Restatement (Second) of Torts (Restatement) § 551(1) addresses the duty to disclose and provides that:

> (1)    One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

The Restatement in § 551(2) specifies that a party to a business transaction is under a duty to disclose to the other party when the matters are known to him because of a fiduciary or other similar relation of trust and confidence between them.  Although the state law standard for nondisclosure is not directly pertinent in a federal fraud trial, looking to California law on this issue can be instructive.  The circumstances under which a duty arises for nondisclosure of material facts under California law include (i) when the defendant is in a fiduciary relationship with the plaintiff; (ii) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (iii) when the defendant actively conceals a material fact from the plaintiff; or (iv) when the defendant makes partial representations but also suppresses some material facts.  *LiMandri v Judgkins*, 60 Cal. App. 4th 326, 335 (1997).

Under some circumstances, a reckless disregard for the truth may be sufficient for the requisite knowledge of falsity.  Under federal law, one looks to § 526 of the Restatement for the principle that a representation may be fraudulent, without actual knowledge of its falsity, if the person making it is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as represented.  In *Paik v Lee (In re Lee)*, 536 B.R. 848 (Bankr. N.D.Cal. 2015), the court found that reckless indifference was satisfied under § 523(a) (2) (A) where a debtor made a representation without regard to knowing the actual facts, where the creditor was the victim of a Ponzi scheme.

A "debtor's misleading conduct intended to convey an inaccurate impression may constitute 'false pretenses.'"  *Kane v Torres (in re Torres)*, 2011 WL 381038 at *5 (Bankr. D. Haw. 2011); see also *In re Russell*, 203 B.R. 303, 312 (Bankr. S.D.Cal. 1996) ("'False representation' is express misrepresentation, while 'false pretense' refers to implied misrepresentations or conduct intended to create and foster false impression.")

    (C)   <u>Del Valle's misrepresentations, fraudulent omissions, reckless disregard and false pretenses</u>

Recognizing an opportunity to profit substantially, Del Valle embarked on a sales campaign with the primary purpose of lining his own pocket, without regard for the accuracy or the believability of what he was purportedly selling.  To recognize the depth of his deception, one needs to stop for a moment and consider whether what he was selling could

have ever had the profitability that he pretended it did.  Any person

schooled in real estate lending, and in particular a licensed real estate

professional, should have known immediately that the product that Solis

was purportedly selling could have never existed on the terms as

represented.

Solis purported to sell interests in existing second trust deeds

(later, even more unbelievably, first trust deeds) that he had purchased

at such an extreme discount that there was room in the principal payment

when due for Solis to take a cut, Del Valle to take a cut, perhaps others

to take a cut[23] and then the ultimate investor to receive a return that

would be 40%, 80% or even more than 100% annualized on his or her

investment.  For example, consider Daniel's investment in the Paris

Street and Shady Lane trust deeds in Hemet, her early purchases which

paid out not only on time, but early.  For an investment of $35,000 in

Paris Street over 4 months, Daniel was to receive a $15,000 return, which

annualized would be more than 100% interest on her investment. For an

investment of $65,000 in Shady lane over 6 months, the return was

$30,000, which annualized to more than 92% interest on her investment.

Before that unrealistic return, Solis and Del Valle had both taken a fee

or commission at whatever amount they thought they could.

Now consider the product:  a second trust deed with a due date in

less than a year and a presumably comfortable cushion of equity such that

---

[23]  Mr. Hooten was brought into the investment scheme by his friend Brent
Anderson and Michael Lugo, who was connected in some way with Del Valle.
Emails admitted at trial imply that these "pyramid style" salespersons
for Del Valle were also taking a fee or commission before they sold the
investment opportunity.

there was no ultimate risk in collection.  No holder of a second deed of
trust that was due to be paid in full in just a few months – that is 100%
on the dollar - would discount it for sale at a rate that would allow
such outrageous returns and certainly hundreds of such holders could not
have been tapped into by Solis.  Del Valle was either stupid, lazy,
entirely untrained as a real estate professional, or just too greedy to
care if such discount purchases could be realistic.  Whichever it was,
his participation in the sale of these investments was fraud.

The simplest findings of fraud are based on the direct
misrepresentations he made in order to sell Daniel and others on these
"opportunities."  First, to make each investor feel special ("I was on
cloud 9 to be one of the few who could benefit from this opportunity" per
Daniel), Del Valle said he wanted only a small, exclusive group of
investors.  He carried out that deception by having only 8-10 people come
to any investment meeting which Daniel attended.  At the end, it was
known that he had 58 investors, hardly a small exclusive group.  That
Daniel was part of a select, exclusive group was false and known by Del
Valle to be false.  Yet it was part of the sales pitch to Daniel.

Second, he presented himself as having a trustworthy credential and
considerable experience in this type of real estate transaction.  He
misrepresented his education by putting "Dr." Del Valle on his
letterhead, something not lost on Daniel who as an engineer thought
education meant success.  He represented that Solis had been in this
business for years when he knew that was not true.

Third, he promised that each property had a high loan to value and
that he had independently verified the same.  He promised that he had

done due diligence and proper investigation on each property in question,

that he had looked at a "Comparative Market Analysis" to ascertain the

values of the houses and that he had used a "Land Title Comparison

Report" to see transactions going "far back in time", including all the

liens and how much was owed on them.  The testimony of expert broker

Joffrey Long verified this court's own understanding of what is available

in an open record online.  First, no website or secondary source can give

an accurate market value of any real property.  The only reliable source

for value is an appraisal, none of which was done on the investment

properties.  Second, the title companies do not make available for free a

reliable website with their proprietary information on liens and chain of

title.  Therefore, Del Valle's testimony that he looked at a website to

see all the liens on properties and what was due on them was not

credible.[24]  Moreover, even if he could ascertain the existing liens with

certainty, he still could not know what was actually owed on them.  That

information could only come directly from the lenders, which he could not

have contacted because he did not even know who they were.  Del Valle was

also inconsistent between his deposition testimony and his trial

testimony on what he had studied to come up with the loan to value

ratios, speaking during the deposition about "ghost seconds" that were

not recorded but that Solis knew about and generally being inconsistent

---

[24]  During cross examination of Long, Del Valle's counsel indicated that
he would call Del Valle on his case in chief to give explicit details
about what he had looked at to verify the liens, value, and other
necessary elements of loan to value.  Tellingly, no such testimony was
given by Del Valle.  And he introduced no exemplary documents.

on the source of his research.  His testimony was false and the

representations he made about verified loan to value were untrue.

He also lied about how the investment money on each property would

be handled.  He told Daniel and others the funds would not be commingled,

both orally and in the Investment Agreement Short Term Note – "In

addition, RDV Consulting will not hold on to due funds for any other

investment other than the property indicated in this contract."  Daniel

was told that her money would be used only to purchase her interest in

each trust deed.  Del Valle knew those statements were not true, if not

earlier, certainly by sometime in 2007, per the emails produced at trial.

He knew that some of the money he collected was used to pay his business

expenses, including making payroll.  He knew by early 2008 that he used

money coming in to directly repay investors for trust deeds which had

come due.[25] The funds were commingled, probably from early on and

definitely by mid 2007.  Del Valle knew that, but misrepresented

otherwise.

Perhaps one of the most critical lies was the representation that

if the homeowner did not pay when the trust deed was due, his company

would foreclose and the returns were therefore guaranteed.  The investors

asked about this at the early meetings.  Del Valle was so anxious to sell

that he represented himself as an expert on foreclosures and assured them

they would be done.  He said this, despite knowing that most of the trust

deed assignments had not been recorded, a critical first step in any

---

[25]  See, for example, Exhibits 93, 94, 97 and 98.

foreclosure.  He had to know that his representations about foreclosures

occurring promptly were false.

        In addition to the direct misrepresentations cited above, Del Valle

had a duty to disclose information known to him which was critical to the

investment decision of Daniel and others.  Per the Restatement cited

above, Del Valle was under a duty to disclose "matters known to him that

[Daniel] [was] entitled to know because of a fiduciary or other similar

relation of trust and confidence between them."  Del Valle was a real

estate broker selling investments in trust deeds and had a fiduciary duty

to Daniel based on his license.[26]  In addition, he created a relationship

of trust and confidence based on his aggressive confidence in the product

and the promised returns.  There is no doubt that in this business

relationship, he owed such duty to Daniel.  And in several respects, he

omitted critical facts.

        First and foremost, Del Valle did not disclose how little he knew

about Solis and the products he sold, both from the beginning and as the

sales continued in 2007 and 2008.  He barely knew Solis, had no idea what

his sources of trust deeds were, and never saw adequate documentation to

assure that the assignments were real.  Although Del Valle claimed that

he had regular meetings with Solis where Solis brought in the assignments

in a brief case but would not let him copy them, the integrity of that

---

[26]  In a bizarre bit of testimony, perhaps thinking he could duck any
liability created by his fiduciary capacity, Del Valle testified at trial
that he did not believe he needed a license to sell the trust deed
interests and did not think he was operating under his broker's license
when he sold those interests.  The testimony of Long directly
contradicted those beliefs and the court gives credence to that
testimony.

testimony is questionable.  Ward testified that he never saw the trust deeds brought in by Solis, although he did say that on occasion Del Valle and Solis met behind closed doors. If Del Valle saw the assignments, it does not make sense that he did not insist on making copies, to protect his own backside if for no other reason.  Moreover, Del Valle admitted that the assignments he saw were often not notarized or not signed at all and that he entirely stopped verifying the assignments after the first couple of months.  Del Valle continued selling the "assigned" trust deed interests for at least two years after he stopped verifying them; he had a duty to tell Daniel he was not doing so.

Del Valle never disclosed that he and Solis were not "we" in the sense of being a functional partnership where each knew fully about the entire business enterprise.  He sold the investments as a joint venture between himself and Solis.  Daniel had every reason to believe they functioned together because Del Valle did not tell her otherwise.

Del Valle did not disclose how he calculated his commissions or "take' off the top.  He testified at trial that he took whatever he thought he could get away with, varying that amount by the cushion in the investment opportunity as represented by Solis.  Although Daniel admitted she knew he was getting a cut, had she known it was entirely random her decision to invest might have altered.

Del Valle never shared that he had no idea what the source of repayment was when a trust deed paid off.  He affirmatively stated it was the homeowner, but he knew that he could not verify whether such statement was accurate.  He did know Solis did not automatically send the money when a trust deed was purportedly due from the homeowner; instead,

1  RDV was required to make demand on Solis, who would then send a check

2  from source unknown.  Ward testified that this arrangement existed during

3  the entire time he worked for RDV.  Because the repayment of the debts by

4  the homeowners was such a critical part of the business model, Del

5  Valle's failure to disclose that his knowledge of the pay outs was

6  limited was a fraudulent omission.

7       Compounding this nondisclosure was Del Valle's direct knowledge in

8  later 2007 and all of 2008 that payments on due trust deeds were being

9  made from new investments.  Had Del Valle disclosed this critical fact,

10 Daniel would have stopped investing because such was not in the business

11 model as represented.[27]

12      Equally important to all the other nondisclosures was Del Valle's

13 failure to disclose his ignorance about the foreclosure process.  The

14 investors expressed concern from the beginning about what would happen if

15 a homeowner defaulted.  Del Valle then assured them foreclosures would

16 take place promptly.  But he did not know anything about foreclosures, as

17 borne out by the fact he did not think recording the assignments was

18 necessary.  Yet he omitted that admission from his sales pitch, a

19 fraudulent omission.

20      When the money stopped coming timely from Solis to pay the trust

21 deeds, Del Valle told Daniel and others that the reason was the economy,

22 refinances were taking longer, and the properties were in foreclosure so

23 money would be delayed.  In actuality, Del Valle knew nothing about the

24 _____

25 [27]  Her last investment of IRA funds in November 2008 came after many
   emails described the use of new money received to pay the investors
26 making the most fuss.

27

28                                      - 28 -

1    reasons for nonpayment.  He made up the reasons.  He should have admitted

2    to Daniel and others his ignorance.

3        RDV was incorporated in 2005 or 2006, before Daniel began investing

4    under its auspices.  The paperwork on the majority of her buys was on the

5    RDV letterhead and RDV was the party to the transactions.[28]

6    Notwithstanding that RDV was doing the selling, per the testimony of Long

7    it had no broker of record until April 2007 (Marco Velazquez who knew

8    remarkably little about the trust deed sales).  Del Valle did not become

9    the broker of record until June 2007.  Yet Del Valle failed to disclose

10   that this entity selling trust deeds was operating without a broker's

11   license for the first year of Daniel's investments.  This critical fact,

12   known only to him, should have been disclosed.

13       Wrapping the affirmative misrepresentations together with the

14   critical omitted facts creates the false pretense that Del Valle was so

15   intent on selling so that he could make money.  The court's observation

16   of the totality of the evidence is that the investment scheme was a false

17   pretense.  Del Valle's entire sales pitch was a false pretense: an

18   impression created by his words and conduct that the investment

19   opportunities were an honest and realistic business venture, which was

20   false.  Del Valle sold himself to be trustworthy (one of the "good guys"

21   as Daniel stated) and the returns to be certain.  Nothing could be

22   farther from the truth.  To be certain, to some extent Del Valle was a

23

24   [28]  In the latter half of 2008, when everything started to go to hell in
     a handbasket, S & D Priority Management, a Del Valle separate company, or
25   RJ Solis Investments appeared as the party on the documents.  The court
     has no information whether either of those entities had a broker of
26   record.

27

28                                        - 29 -

misled by his own reckless disregard for the truth about what he was
selling, but that does not provide an excuse for his active
misrepresentations and blatant omissions which were perpetrated to snare
the victims from whom he profited.

(D)    Knowledge of Falsity

Daniel did not prove that Del Valle knew the trust deeds were false
and that Solis was operating a Ponzi scheme, nor did she assert in her
closing briefs that she had done so.    However, as noted above, under
Civil Rule 15 such proof was not necessary.    She was only required to
prove that Del Valle knew the falsity of his representations or knew the
truth of the important facts he failed to disclose. She has borne that
burden of proof.

The findings above make clear that Del Valle had full knowledge of
the falsity of what he said: (1) there was not an exclusive group of
investors; he was profiting from 58 of them, over and over again; (2) he
was not experienced in the sale of trust deeds and had no idea what his
broker's license required him to do; (3) he was lying about his ability
to know a true loan to value, both because no appraisals were prepared
and because he had no reliable source to verify the liens or the amounts
due on each; (4) he was commingling funds, such that each investment was
not segregated for buying only the trust deed interest at issue; and (5)
he could not assure a profitable foreclosure would be done upon default.

He also was well aware of the important facts that he failed to
disclose: (1) he had no specific knowledge about the veracity of Solis's
business and he did not verify that signed assignments were held for each

investment opportunity; (2) he knew funds were commingled because

investment funds were used for his business expenses and to pay other

investors;  (3) he had no way of knowing the actual source of funds for

pay offs; (4) he was clueless about the foreclosure process; and (5) as

owner of RDV, he knew there was no broker until April 2007.

His knowledge of falsity was apparent from the evidence.

(E)   Intent to Deceive

Rare would be the instance where a defrauder would explicitly admit

he intended to deceive his victim.  The law, therefore, has recognized

that to prove intent, one must do so with circumstantial evidence and

conduct, analyzed under a totality of the circumstances standard.  *Talent*

*v Kaufman (In re Tallant)*, 218 B.R. 58, 66 (9th Cir. BAP 1998); *Gertsch v*

*Johnson & Johnson Fin. Corp (In re Gertsch)*, 237 B.R. 160, 167-168 (9th

Cir. BAP 1999).  The scienter requirement for a fraudulent

misrepresentation is established by showing either actual knowledge of

the falsity of a statement or reckless disregard for its truth.  *Id.* 237

B.R. at 167; *In re Houtman, 568 F. 2d 651, 656 (9th Cir. 1978).* Weighing

the evidence here, the court finds that Del Valle acted with the

requisite intent as well as a reckless disregard of the truth or falsity

of what he was selling.

Evident from the beginning of Del Valle's solicitation of investors

was that he hoped to profit from their participation; the more

investments, the more he would make.  This could not have been more

apparent than from his testimony that he evaluated each purchase

1  opportunity for "how much room" there was in it for his discretionary

2  take.  His profit came first; everything else second.

3       He was so anxious to rope in those whose money would fill his bank

4  accounts that he immediately started lying so that he could sell.  Like a

5  carnival barker, he used any available tactic to lure in his victims.  He

6  enticed them by making them feel special, one of the chosen, exclusive

7  group who could make such outrageous profits.  He oversold his credential

8  and expertise:  "Dr. Del Valle" when he knew he held no doctorate degree.

9  There could be no purpose for that deception other than to sell his

10  expertise and therefore his product.  To assuage any concerns about risk,

11  he lied about his due diligence, assuring a fixed return based on a

12  fictitious, unverified loan to value which he knew or should have known

13  could not be proven without an appraisal of the property and

14  conversations with borrowers or lenders to ascertain the amounts due on

15  trust deeds of record.

16       He did not tell his investors that he had no clue how a foreclosure

17  could be done to protect their interests.  He played on their ignorance

18  by writing on the Short Term Note words about how they would get late

19  fees and other enhancements if a foreclosure occurred[29], words which were

20  pure nonsense.  He never told Daniel that he had no idea if her pay outs

21  were actually coming from the homeowners.  And, as time went by and he

22

23  [29]  For example, see Exhibit 9 and the words in the Note:  "Foreclosure
proceedings may take over 90 days from filling [sic] and may come with
24  additional risks.  There will be a late fee due to the investor for the
extra hold time due to time associated with collections.  The late fee
25  will be a 33% profit from sale of foreclosure or 33% of late fees due to
sale of home in case if the deed is not paid out on time."  No defaulting
26  homeowner is paying a late fee.  A 33% late fee is unheard of.

27

28                                      - 32 -

was regularly using new money to pay his own expenses and pay older trust

deeds, he did not tell her he was commingling funds in contravention of

his promises.  That alone would have meant that Daniel and others would

stop investing and his cuts would cease.

There is no rational explanation for Del Valle's deceptions and

omissions other than they were necessary to his sales pitch, necessary to

his profit motive, necessary to keep the money flowing into his coffers.

The totality of the circumstances shows overwhelmingly an intent to

deceive.

(F)   Justifiable reliance

The Supreme Court in *Field v Mann*, 516 U.S. 59 (1995) ruled that a

creditor's reliance on a misrepresentation need only be justifiable, not

reasonable, for an exception to discharge under § 523(a)(2)(A).

Justifiable reliance is a lower standard of care than reasonable

reliance.  Even if the falsity of a representation could have been

ascertained upon investigation, no investigation is necessary for

justifiable reliance.  See, *Citibank (South Dakota) N.A. v Eashai (In re

Eashai)*, 87 F. 3d 1082, 1090-91 (9th Cir.1996).  Such reliance is a

mixture of objective and subjective standards, which takes into account

knowledge and the relationship of the parties.  *Romesh Japra, MD.

F.A.C.C., Inc. v Apte (In re Apte)*, 180 B.R. 223 (9th Cir. BAP 1995).

Del Valle was one of the "good guys" per Daniel.  She trusted his

friendly personality, his credential, and his expertise in real estate

matters.  He had answers for all her questions.  When the returns

starting coming at the rate advertised, that bolstered her belief that

everything was on the up and up.  Even when the payments slowed down, she

trusted his fictional reasons that refinances were taking longer and

certain properties were going through the foreclosure process, enough so

that she invested $70,000 of her retirement funds in November 2008, long

after defaults had begun to occur.  But for her reliance on Del Valle's

promises, Daniel would not have invested the sums which resulted in the

unpaid deeds for which she claims damages.[30]

The evidence of justifiable reliance is sufficient for a finding of

fraud.

(G)   <u>Damages proximately caused by Daniel's reliance on Del Valle's</u>

<u>misrepresentations and omissions.</u>

(1) Daniel's Own Unpaid Deeds – Measure of Damages

The causation factor in a fraud analysis is essentially a "but for"

analysis:  But for Del Valle's misrepresentations and omissions Daniel

would not have invested in the trust deeds that were unpaid at the end.

Daniel's chart of Unpaid Deeds, Exhibit 324, lists every trust deed

investment that she made with RDV or a Del Valle entity the principal of

which remained unpaid, a total of $878,200 she paid out and never saw

again.  Certainly Del Valle's acts were the cause for her loss of those

funds.  However, as noted on Exhibit 324, not all of that money came

---

[30]  An argument can be reasonably made that Daniel did not rely on Del
Valle's representations at all (justifiably or otherwise) when she made
her first two investments in April 2006.  Her friend Harper shared with
her investment opportunities which had been presented to him.  He also
did some minimal online research to verify some of the details about the
properties.  However, these trust deeds were paid in 2006 and are not
among those for which she is claiming damages.  Therefore, her early
reliance on Harper does not impede the court's finding that she
justifiably relied on Del Valle.

initially from her bank accounts; $346,871[31] were fictional returns which

she had "earned" and were part of the total funds she received from pay

outs on earlier investments.  Consistent with Exhibit 324, to calculate

the "new" dollars she lost one must subtract the reinvested returns from

the total, which results in a total out of pocket loss of $531,329.

The unpaid deeds cover investments made between September 2007 and

November 2008.  By September 2007 all of the misrepresentations and

omissions which caused Daniel to invest and then reinvest were in full

force.  Although there were signs that something major was amiss by the

time of Daniel's last investment, from her IRA on November 5, 2008, Del

Valle was still actively lying to her, telling her refinances were in the

works and that foreclosures were taking place.  She had no reason to

doubt him; therefore, even this last investment was justified and the

damages were caused by his fraud.  Therefore the full sum of $531,329 is

her measure of recoverable damages.

In her Response to Jose Del Valle's Closing Brief[32] Daniel looked to

state law, California Civil Code 3343(a), rather than federal law for the

---

[31]   This sum is a total of the end return pay outs ($335,571) and the
monthly payments she received on both paid and unpaid deeds ($11,300).

[32]   The tactic used by Daniel's counsel to include the damages argument
and analysis in her *responsive* post trial brief was entirely improper and
sanctionable if it had resulted in a concrete damage or prejudice to Del
Valle.  A *responsive* brief is just that:  intended to be responsive to
the arguments raised in the other party's opening post trial brief.
Daniel's counsel's intentional decision to leave damages briefing to her
reply, as admitted apparently without shame in her brief filed on June 5,
2017, was not only unprofessional but wrong.  No wonder Del Valle's
counsel was outraged, deservedly so.  The court could have disregarded
these arguments, which should have been made in the opening brief to be
considered.  However, the court did its own research on the proper
measure of damages; the improper brief had no positive effect in favor of

measure of damages based on fraud, arguing among other things that she
was entitled to reasonably earned or anticipated profits in addition to
the sums actually expended.  This reliance on § 3343 is wrong.  Since
this case was tried under a federal statute, § 523(a)(2)(A), the court
must rely on federal standards for a tort recovery.  As the Supreme Court
stated in *Field v Mans*, one must look to the Restatement as "the most
accepted distillation of the common law of torts" for components of
fraud. Many federal cases have adopted the Restatement as their guide on
fraud damages[33], in particular § 549(1)(a), which calls for the recovery
of out of pocket losses – i.e. when the thing acquired is of lesser value
than the thing parted with, or (1)(b), which calls for indirect or
consequential damages if a "loss results from a purchaser's use of the
article for a purpose for which it would be appropriate if the
representation were true but for which it is in fact harmfully
inappropriate."

 Here, Daniel suffered no consequential damages since the "article"
was cash, so her recoverable loss is her out of pocket losses, i.e. what
she parted with in hopes of gain, plus the time value of her money
(interest, addressed below). Exhibit 324 shows that her net out of pocket
losses were $531,328.

---

Daniel since she relied upon the wrong law, state versus federal, for her
arguments. Therefore, though the tactic was distasteful, it did not
result in prejudice to Del Valle.

[33]  See, for example, *Knobb v Rollison (In re Rollison),*  500 B.R. 663
(10th Cir. Bap 2013); *Gem Ravioli, Inc. v Creta (In re Creta)*, 271 B.R.
214 (1st Cir. BAP 2002)

Restatement § 549(2) also allows recovery in a business transaction

of "additional damages sufficient to give him the benefit of his contract

with the maker, if these damages are proved with reasonable certainty."

Where, as here, there is no true benefit of the contract since the entire

scheme was a false premise, there can be no proof "with reasonable

certainty" what Daniel should have gained.  That is the nature of a Ponzi

scheme: any expected profit is false because there is no business from

which to profit.  In this circumstance, the court is unable to award her

any benefit of her bargain.

        (2)   Prejudgment Interest on Daniel's own out of pocket

            losses

An award of prejudgment interest in a §523 proceeding in which the

creditor prevails ensures the creditor is made whole and has a full

recovery.  See *Cohen v de la Cruz*, 523 U.S. 213, 222-23 (1998).  Such an

award lies within the sound discretion of the bankruptcy court.  *Saccheri

v St. Lawrence Valley Dairy (In re Saccheri)*, 2012 WL 5359512 (9th Cir.

BAP 2012); *Barnard v Theobald*, 721 F. 3d 1069, 1078(9th Cir. 2013)..

"Awards of prejudgment interest are governed by considerations of

fairness and are awarded when it is necessary to make the wronged party

whole."  *Purcell v United States*, 1 F. 3d 932, 942-43 (9th Cir. 1993).

The correct rate of prejudgment interest in federal court depends

on the nature of the claims.  *Oak Harbor Freight Lines, Inc. v Sears

Roebuck, & Co. 513 F. 3d 949, 961 (9th Cir. 2008).  Even in a federal

question case, where the federal interest rate ordinarily applies, the

court may choose a different rate if "the equities of a particular case*

*demand a different rate."* S.E.C. v Platforms Wireless Int'l Corp, *617 F. 3d 1072 1099 (9th Cir. 2010).*

As Daniel has noted, although the nondischargeability of Del Valle's debt owed to her arises under a federal statute, the debt at issue is really a creature of state law – a failure to receive the return of her money.  Exercising its discretion as the law allows, the court concludes that equity here would support an award of prejudgment interest at the California rate of seven percent as set forth in California Constitution, Article 15, section 1.  This interest would be calculated from the date of each investment between September 2007 and November 2008 until entry of the federal judgment, from which time the judgment will carry interest at the federal judgment rate.[34]

(3)    Daniel is not entitled to punitive damages

As set forth in the Procedural Background section above, the court found that the state court complaint which contained a prayer for punitive damages was not tried here.  The Pretrial Stipulation having waived any issues raised in the state court litigation other than those identical to § 523(a)(2)(A) and no punitive damages having been claimed here, none will be awarded.  However, even if Daniel had properly prayed for punitives, none would have been awarded.

The Restatement provides for punitive damages at § 908:

(1)    Punitive damages are damages, other than compensatory or

nominal damages, awarded against a person to punish him

---

[34]  The Court will ask Daniel to do the calculations so that the Judgment entered here has the appropriate total amount of prejudgment interest.

1          for his outrageous conduct and to deter him and others

2          like him from similar conduct in the future.

3      (2)   Punitive damages may be awarded for conduct that is

4          outrageous, because of the defendant's evil motive or

5          his reckless indifference to the rights of others.  In

6          assessing punitive damages, the trier of fact can

7          properly consider the character of the defendant's act,

8          the nature and extent of the harm to the plaintiff that

9          the defendant caused or intended to cause and the wealth

10         of the defendant.

The comments to the Restatement emphasize that punitive damages may be awarded when a defendant acts with an evil motive and they are intended to punish the defendant and deter future bad acts.  Although Del Valle was driven by greed and said whatever he thought would lure in more investors without regard for whether it was true, the court cannot find he acted with an evil motive or an intent to injure Daniel.  Although his behavior was often grossly negligent, it was not outrageous such that it would shock the conscience.  Perhaps if the court had made a finding that Del Valle knew the trust deeds were false, an award of punitive damages would have been appropriate here, as he would have known from day one that Daniel would be substantially economically injured.  But the court has not made this finding, does not see an evil motive or outrageous conduct, and therefore would not award punitives even if they were included in the relevant prayer for relief.

(4)   Unpaid Deeds of Others; Standing of Daniel to Sue

On Exhibit 324, Unpaid Deeds, Daniel has a column for "Friends", showing the substantial investments that were made in her name where the source of the funds was her friends, the arrangement that Del Valle compelled by his illusion of exclusivity. Sadly, this column shows a total of $1,259,900 was paid in by her friends and never paid back, without accounting for any expected return.[35]  Daniel made several arguments in support of her right to sue for them: (a) an assertion that she had an oral assignment of their claims; (b)an argument that she was the real party in interest under Civil Rule 17; (c) a claim that she had both Article III and prudential standing; and (d) a contention that if the court should find she lacked the ability to sue for her friends, they should be allowed to join now as party plaintiffs under Civil Rule 17(a) (3). None of these arguments works and Daniel cannot recover in this litigation what her friends lost, nor can they join as plaintiffs 7 years after the bar date.

A federal court may exercise jurisdiction over a litigant only when that litigant meets constitutional and prudential standing requirements. *Elk Grove Unified Sch. Dist. V Newdow*, 542 U.S. 1, 11 (2004); *Veal v American Home Mortgage Serv. Inc. (In re Veal)*, 450 B.R. 897, 906 (9th Cir. BAP 2011). Standing is a "threshold question in every federal case,

---

[35]  Unlike the sums for Daniel, for which a net sum can be calculated because she listed the amount of returns from prior investments which she reinvested, a net sum of friend investments cannot be calculated. The court has no way of knowing what part of the $1,259,900 came from "profits" from earlier investments, but some of it certainly did because the evidence shows at least some of the friends invested as early as 2006, received returns, and then invested again in 2007 and 2008. The fact that the court cannot ascertain a net figure, however, does not matter since it concludes that Daniel cannot sue for that money anyway.

1 determining the power of the court to entertain the suit." Id.; Warth *v*

2 *Seldin*, 422 U.S. 490, 498 (1975).

3     Constitutional or Article III standing requires an injury in fact,

4 which is caused by or fairly traceable to some conduct or some statutory

5 prohibition, and which the requested relief will likely redress. *In re*

6 *Veal*, 450 B.R. at 906; *Sprint Commc'ns Co. v APCC Servs., Inc.*, 554 U.S.

7 269, 273-74. In addition, prudential standing "'embodies judicially

8 self-imposed limits on the exercise of federal jurisdiction.'" *Sprint*,

9 554 U.S. at 289… (quoting *Elk Grove*, 542 U.S. at 11. One component of

10 prudential standing is the doctrine that a plaintiff must assert its own

11 legal rights and may not assert the legal rights of others. Id.

12     The facts of this case establish that Daniel does not have either

13 Constitutional or prudential standing to recover as damages the losses

14 which her friends sustained. Although Daniel was the "contractual" party

15 to the investor arrangement sold by RDV and Del Valle (meaning her name

16 and signature were on the documentation – the court need not rule on

17 whether those documents were contracts), the money invested was not hers

18 and the loss of that money was not her loss or damage. In addition, her

19 friends who lost the money did not hold Daniel responsible for their

20 loss; none of them sued her on a negligence or indemnification claim and,

21 quite frankly, none of them asserted any blame whatsoever against her for

22 enticing them into Del Valle's fantasy scheme. Their loss was not her

23 loss, economically or otherwise. As a consequence, Daniel lacks the

24 injury in fact required by Constitutional standing; an award of damages

25 based on her friend's investments would not redress relief needed by her.

26

27

28                                   - 41 -

1  She also cannot meet the prudential standing requirement that she

2  assert her own legal rights, not the legal rights of others.  The sole

3  claim for relief at issue in this trial is one for fraud.  An **element** of

4  fraud is **damages proximately** caused by the misrepresentation or omission.

5  Because Daniel has no liability to her friends for their losses, she

6  holds no claim for fraud based on their investments.  She cannot meet the

7  threshold for prudential standing.

8  As highlighted here, fraud is a specific individualized claim, as

9  not only must the individual damages be caused by the fraud but the

10  percipient elements of fraud – an intentional misrepresentation of fact

11  or an omission of facts which one has a duty to disclose -  cannot be

12  asserted by anyone other than he or she who hears the representation and

13  relies on it.  As far as the evidence introduced at trial showed,

14  Daniel's friends did not hear and rely on Del Valle's sales pitch; they

15  did not hear him directly tout the exclusive group or the loans to value

16  or the easy foreclosure upon default.  Since they did not hear him, they

17  could not have relied on his words and actions when they invested.  They

18  relied on Daniel.  The cited case, *Maddux v Philadelphia Life Ins. Co.*,

19  77 F. Supp. 2d 1123, 1132 (S.D. Cal. 1999), is directly on point and,

20  despite her efforts, Daniel has not succeeded in distinguishing it.

21  In *Maddux*, a surviving spouse as plaintiff sued the insurer of her

22  late husband for false promise fraud when the company declined to pay the

23  death benefits to her as beneficiary of the policy.  She asserted that

24  the insurer had falsely represented the coverage of the policy when it

25  sold it to her husband.  The trial court granted summary judgment for the

26  insurer on the fraud claim based on plaintiff's lack of standing, saying:

27

28

"a plaintiff may not generally maintain an action for fraud unless plaintiff was the person to whom the alleged misrepresentations were directed." *Maddux* at 1132.  Similar circumstances exist here:  the friends would need to be the parties who heard Del Valle's sales pitch and relied on his lies before fraud could be proven.  Only those who hear can sue for fraud.

Standing, the non-waivable jurisdictional requirement, is often conflated with the real party in interest doctrine found in Rule 7017, which incorporates Civil Rule 17, which can be waived if not raised timely by a defendant.  Civil Rule 17(a)(1) starts simply:  "An action must be prosecuted in the name of the real party in interest."  The exact definition of a real party in interest defies articulation but its function and purpose are well understood.  As stated in the Advisory Committee Notes for Civil Rule 17

> In its origin, the rule concerning the real party in
> interest was permissive in purpose; it was designed to
> allow an assignee to sue in his own name.  That having
> been accomplished, the modern function of the rule in
> its negative aspect is simply to protect the defendant
> against a subsequent action by the party actually
> entitled to recover, and to insure generally that the
> judgment will have its proper effect as res judicata.

Notes of Advisory Committee on 1966 Amendments to Rule 17.

Most real party in interest inquiries focus on whether the plaintiff holds the rights he or she seeks to redress and, in that sense, seems identical to Constitutional standing.  However, sometimes statutory

or common law recognizes relationships in which parties may sue in their own name for the benefit of others, such as a guardian suing for his or her ward, an assignee for collection suing in its own name on its assignor's debt.  In either instance, the goal of the inquiry is a determination whether the party bringing the action will be preclusive on any other party holding the rights. Suffice it to say that on these facts, Daniel cannot be the real party in interest to assert her friends' legal rights because her lack of Constitutional standing disqualifies her; she cannot bind them.

Daniel essentially abandoned her assignment claim.  She made no attempt to prove that she had an oral or implied assignment of the legal rights of her friends.  None of the friends testified and no documentation, email or more formal, was presented to show evidence of such assignments.  Even if a fraud claim could be assigned, as it could not as discussed above because of its individual nature, there were no assignments here.  Daniel cannot assert her friends' rights based on that theory.

Finally, it is far too late for the friends to step forward under the savings clause in Civil Rule 17(a)(3), which provides the court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to be substituted into the action. In order for the friends to become the party plaintiffs, they must have saved the bar date set by Rule 4007(c), asserting the nondischargeability of their fraud claims within 60 days of the initial 341(a) hearing in 2010.  The Rule 4007(c) deadline is a hard deadline unless extended

before it first expires.  It may not be extended by any equitable

factors, among them a mistaken belief that someone else can sue for one's

own fraud. *Anwar v Johnson (In re Johnson)*, 720 F. 3d 1183, 1187 (9th

Cir. 2013).

In summation, Daniel lacks Constitutional and prudential standing

to sue for damages which are not her own.  Because her friends have not

held her responsible for their losses, her legal rights have not been

implicated by their investment losses.  Moreover, she cannot state a case

for a fraud perpetrated upon them since they must establish their own

justifiable reliance on misrepresentations or omissions.  Recovery for

her friends' investments is denied.

(5)   Attorney's Fees Are Not Available

In a footnote in Plaintiff's Response to Jose Del Valle's Closing

Brief, Daniels requests the opportunity to file a post trial motion for

recovery of attorney's fees.  As authority for this request, Daniel cites

*Glendale Federal Savings and Loan Ass'n. v Marina View Heights

Development Co, Inc.*, 66 Cal. App. 3d 101 (1977).[36]  As discussed below,

*Glendale Federal v Marina* View does not provide authority for Daniel to

recover attorney's fees in this litigation.

Bankruptcy courts recognize the "American Rule" that "[t]he damages

in a tort action do not ordinarily include compensation for attorney fees

or other expenses of the litigation."  Restatement (Second) Torts §

914(1); *Travelers Cas. And Sur. Co. of America v Pacific Gas and Elec.*

---

[36]  Neither the footnote in the brief nor the Table of Authorities
included a case citation, so Daniel's desired pin cite cannot be
ascertained.

*Co.*, 127 S. Ct. 1199, 1203 (2007).  In nondischargeability litigation, an award of attorney's fees to a successful creditor may only occur if such fees are recoverable for a similar tort claim under state or federal law. *AT&T v Pham (In re Pham)*, 250 B.R. 93, 98-99 (9th Cir. BAP 2000); Bertola *v Northern Wisconsin produce Co. (In re Bertola)*, 317 B.R. 95, 100 (9th Cir. BAP 2004); Fry *v Dinan (In re Dinan)*, 448 B.R. 775, 785 (9th Cir. BAP 2011).  Under California law, attorney's fees may be recovered in a case for fraud if the parties' relationship is established by a written agreement with an attorney's fees clause written broadly enough to cover the prevailing party in such fraud action.  *See*, for example, *Santisas v Goodin*, 17 Cal. 4th 599, 619 (holding that seller defendants in real estate sales litigation have a right to recover as costs the attorney fees they incurred in defense of the fraud claims under the broad language of the relevant attorney's fees clause).

Daniel has not pointed out, nor has the court seen, a written agreement between her and Del Valle with an attorney's fees clause broad enough to cover tort litigation.  For that matter, none of the documentation of the investment transactions has any attorney's fees clause whatsoever.  Without a clause similar to that in *Santisas*, Daniel cannot prevail on a post trial motion for attorney's fees.

The right to recover fees addressed in *Glendale Federal* is a different right:

> Although as a general rule attorneys' fees incurred by a plaintiff in an action for damages for fraud are nonrecoverable [citations], an exception is recognized where a plaintiff, as a proximate result of defendant's

1    fraud, is required to prosecute or defend an action

2    against a third party for the protection of his

3    interest. [citation] In such cases reasonable attorneys'

4    fees incurred in connection with the third party lawsuit

5    are recoverable as damages caused by defendant's

6    tortious act.

7  *Glendale Federal*, 66 Cal. App. 3d at 149.

8    Daniel did not pursue any third party litigation to protect her

9  investment rights impacted by Del Valle's fraud. As a consequence, this

10 theory for fee recovery also fails.  Daniel has no right to recovery of

11 her attorney's fees incurred in this litigation.

12    (H)   Del Valle's Defenses Fall Flat

13    From early in the Del Valle's chapter 7 case, starting with

14 statements made when the § 727 denial of discharge was granted, then

15 vacated, and continuing with arguments made to the court during discovery

16 disputes and in response to Daniel's motions, Del Valle cried that he was

17 also a victim of Solis's Ponzi scheme and therefore could not himself

18 have been a perpetrator of fraud.  He asserted that he and Olivia had

19 lost all their savings and retirement funds by investing them in trust

20 deeds that in the end were not paid off.  Not only that, but he had also

21 enticed parents and in-laws to make trust deed investments by promising

22 the huge profits that he was making could be had by them. And then, they

23 too lost everything they had invested.  How could he be the source of the

24 fraud when he and his family took such substantial losses?

25    Admittedly, there was a certain credence in such claims, as common

26 sense would dictate that if he knew Solis was a fraudster, why would he

27

28                                      - 47 -

throw his own money away?  Unfortunately for Del Valle, there was no

substance behind his assertions.  Not only did he present no written

evidence to document his losses, he never even testified that he had

sustained any loss whatsoever.  Nor did Olivia.  If there was truth to

such assertions, why did he not testify under oath about them?  The court

is entitled to draw an implication from his silence:  that such losses

never did occur and that the whole "victim" defense was just a smoke

screen

    To be sure, he did offer the testimony of Blanca Ortiz, his mother

in law, whom he had enticed into buying trust deeds.  Undoubtedly, he

took his own customized cut when she bought multiple trust deeds,

profiting from her as he did all others.  Her testimony as to her losses

was somewhat uncertain as to the amount lost and the sum appeared to be

substantially less than touted.  After taking into account any profits

she might have made, this one bit of family loss was not very persuasive.

In addition, although she might have been a victim, Del Valle himself

profited from her invested money, multiple times, so there is no proof

that he was victimized as a defense to his liability.

> (I)    The Community Discharge Does Not Protect Future Community
>        Assets, Such as Del Valle's Earnings, from Execution on a
>        Nondischargeable Judgment

    The court earlier stated that it will enter judgment for Olivia on

the fraud claims, so that the discharge she received has no exception for

Daniel's claims.  In general, where a debtor spouse receives a discharge

of the other spouse's debt, her discharge bars creditors from recovering

their debt against after-acquired community property such as Del Valle's

future earnings.  Section 524(a)(3) provides:

> A discharge in a case under this title operates as an
> injunction against the commencement or continuation of
> an action, the employment of process, or an act to
> collect or recover from, or offset against, property of
> the debtor of the kind specified in section 541(a) (2)
> of this title [community property] that is acquired
> after the commencement of the case, on account of any
> allowable community claim . . . .

But the statute is not done, and continues to state

> e**xcept** a community claim that is excepted from discharge
> under section 523, 1228(a)(1), or 1328(a)(1), or that
> **would be so excepted,** determined in accordance with the
> provisions of sections 523(c) and 523(d) of this title,
> in a case concerning the debtor's spouse commenced on
> the date of the filing of the petition in the case
> concerning the debtor, whether or not discharge of the
> debt based on such community claim is waived. (**e**mphasis
> added)

In other words (admittedly the words of the statute are dense), as

pointed out in *Rooz v Kimmel (In re Kimmel)*, 378 B.R. 630, 636 (9th Cir.

BAP 2007), the operative statutory language provides that the protection

of after-acquired community property from liability for a prepetition

community claim does not apply when the claim is excepted from the

spouse's discharge.  Therefore, Olivia's discharge does not serve to

1  protect after-acquired community property from Daniel's nondischargeable

2  judgment.  The judgment this court will enter will include such finding

3  as an operative term.

4

5

6                              CONCLUSION

7       For the reasons stated above, a nondischargeable judgment under §

8  523(a)(2)(A) will be entered in favor of Plaintiff Cynthia Daniel and

9  against debtor Jose Robert Del Valle (and the future community property

10  of Olivia Del Valle) in the principal sum of $531,329 plus prejudgment

11  interest at the annual rate of 7% calculated for each separate investment

12  amount from the date such investment was made up to the present date.

13  Daniel's counsel is requested to make those interest calculations and

14  present a judgment consistent with this memorandum.

15

16                              ###

17

18

19

20

21

22

23

24

25       Date: October 5, 2017

26                                     Meredith A. Jury
                                       United States Bankruptcy Judge

27

28                              - 50 -